# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JERRY H. FLEMING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. CV-08-S-2336-NE** |
| | ) | |
| **CULLMAN REGIONAL** | ) | |
| **MEDICAL CENTER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jerry H. Fleming, filed this case on December 12, 2008. He alleges that his former employer, Cullman Regional Medical Center, violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by terminating his employment in order to prevent his pension from vesting. Plaintiff also claims that CRMC terminated his employment because of his age, in violation of the Alabama Age Discrimination in Employment Act ("AADEA"), Ala. Code § 25-1-20 *et seq.* (1975).[1] The case currently is before the court on defendant's motion for summary judgment on all of plaintiff's claims,[2] and, defendant's motion to strike portions of plaintiff's affidavit.[3] Upon consideration of defendant's motion for

---

[1] *See* doc. no. 1 (Complaint).

[2] Doc. no. 17.

[3] Doc. no. 21.

summary judgment, the briefs, and the evidentiary submissions, the court concludes

that the motion should be granted.  The motion to strike will be denied as moot.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[4]  In

other words, summary judgment is proper "after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman*

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-

moving party are not unqualified, however.  "[A]n inference is not reasonable if it is

only a guess or a possibility, for such an inference is not based on the evidence, but

---

[4] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

Defendant, Cullman Regional Medical Center ("CRMC"), is in the business of

providing healthcare services to residents in the Cullman County, Alabama, area.[5]

> Hospice of Cullman County is a division of CRMC which enables the hospital to provide even better patient care and support.  Hospice of Cullman County is a nonprofit and United Way agency.  Hospice staff members are available to talk on a variety of topics to church groups, civic organizations, clubs, etc.  Topics include pain management, grief, living wills, hospice care, volunteering, etc.[6]

Plaintiff, Jerry H. Fleming, is an ordained minister.   He received an

---

[5]Defendant's evidentiary submission, Exhibit 1 (Declaration of Toni Geddings), at ¶ 2.
[6]*Id.* at ¶ 3.

undergraduate degree in an unspecified field of study from Southeastern Bible College in Lakeland, Florida, during 1973. Three years later, he received a Master's Degree in missionary sciences from the Assembly of God graduate school in Springfield, Missouri.[7]  Plaintiff served as the pastor of various churches during his career, including the Jones Chapel Church of God in Cullman, Alabama, where he began preaching in 1991. Plaintiff resigned his position at Jones Chapel Church of God in January of 2010, due to his wife's health problems.[8]

In approximately 1999, the former Chaplain of Hospice of Cullman County (whose name plaintiff could not recall during his deposition) told plaintiff there was an opening within the Hospice organization that plaintiff should consider. The former Chaplain also told plaintiff that Hospice was looking for applicants with an education, and that plaintiff should meet with Tony Tidwell, the Director of Pastoral Care and Volunteer Services at CRMC, to inquire about the job.[9]

Tidwell acknowledged that there was a job opening at Hospice, but he recommended that plaintiff should take Clinical Pastoral Education ("CPE") courses instead of applying for the job, and then "go from there."[10]  Tidwell also informed

---

[7]Plaintiff's evidentiary submission, Exhibit 2 (Deposition of Jerry Fleming), at 16-21.

[8]*Id.* at 20-39.

[9]*Id.* at 45-59; plaintiff's evidentiary submission, Exhibit 3 (Deposition of Tony Tidwell), at 7-8.

[10]Fleming Deposition, at 49-50.

plaintiff that a CPE course soon would begin at CRMC, and that plaintiff could complete his coursework there.[11]   Plaintiff signed up for the CPE course at CRMC, and he was assigned to complete the clinical component of his coursework at Hospice of Cullman County.[12]   Between 1999 and 2002, plaintiff completed four twenty-week units of CPE, the maximum number of units available to him.[13]   While plaintiff was in CPE training, Tidwell was his supervisor.[14]

In late 2001, while plaintiff was still working on his fourth unit of CPE, Tidwell asked if he would fill in as the Chaplain at Hospice of Cullman County for approximately one month, until Henry Hopson, the current Chaplain, returned from a medical absence.   While plaintiff was not paid for the work he performed for Hospice in satisfaction of the clinical requirements of his CPE, he was paid during the time period he filled in for Hopson.   After Hopson returned to work, Marti Smith, the Director of Hospice Services, asked plaintiff to stay on and continue to work as a Chaplain two days a week.   Plaintiff agreed, and he worked two days a week for approximately six or seven months.[15]

In 2003, Marti Smith asked plaintiff if he would serve as Hospice Chaplain

---

[11]*Id.* at 50-51.

[12]*Id.* at 42-43.

[13]*Id.* at 54-55, 60-62.

[14]Tidwell Deposition, at 14-15.

[15]Fleming Deposition, at 62-63, 77-79, 88-89.

during some upcoming inspections, because Henry Hopson had been summarily dismissed from the position. Plaintiff agreed, and he also applied for the permanent position as Chaplain that was left vacant by Hopson's departure. Plaintiff interviewed with Marti Smith and Tony Tidwell in July of 2003, and, two or three weeks later, he was awarded the position. Tidwell later told plaintiff that he had recommended him for the Chaplain position because he was the most qualified person for the job.[16]

Plaintiff and Tidwell had only limited contact while plaintiff was Chaplain. Despite the fact that Tidwell was listed as plaintiff's supervisor when plaintiff's employment was terminated in 2008, Tidwell acknowledged that he did not actually engage in any supervisory duties regarding plaintiff.[17] Even so, Tidwell testified that plaintiff did not do a good job as Chaplain. According to Tidwell, plaintiff would "overstep his boundaries" by making promises to the families of patients in the critical care unit that were inconsistent with the unit's policies.[18] Tidwell also believed that plaintiff espoused sexist views toward women.[19] Tidwell appears to have based that belief over conflicts plaintiff had with two female co-workers, as well

---

[16]*Id.* at 66-67, 90-96.

[17]Tidwell Deposition, at 21-24.

[18]Tidwell Deposition, at 14-19.

[19]Defendant's evidentiary submission, Exhibit 2 (Declaration of Tony Tidwell), at ¶ 4.

as on two complaints that were lodged against plaintiff by a female co-worker.  The record contains evidence of these conflicts and complaints, and the court will relay them in the light most favorable to plaintiff.  First, plaintiff had disagreements with Paula Burke, the head of the critical care unit, because Burke believed plaintiff "overstepped his boundaries," as discussed above.[20]  Plaintiff also engaged in a heated disagreement with Debbie Doss, the former Director of Hospice, over the manner in which different chaplains should be assigned patients to care for.  He raised his voice with Doss, but Doss understood that plaintiff was "just a loud person" because he was a Pentecostal preacher.[21]

Plaintiff also was disciplined on two separate occasions for inappropriate interactions with a female co-worker, Debbie Williams.  First, on November 26, 2003, plaintiff received a written warning for inappropriately touching Williams on the shoulder.  The "Action Plan" proposed to correct plaintiff's violation was as follows:

> Jerry will not touch fellow staff members in a threatening way or a manner that could be construed as threatening.  Jerry will have his current probationary period extended for three months.  The current initial probationary period will end on January 27, 2004, this will be extended until April 27, 2004.  Any further incidents of this nature will result in further disciplinary action up to and including termination.[22]

---

[20]Tidwell Deposition, at 19.

[21]Fleming Deposition, at 105-08.

[22]Tidwell Declaration, at Exhibit B.

Plaintiff explained during his deposition that he touched Williams' shoulder because she was crying, but he acknowledged that he did not ask Williams' permission before touching her.  He also acknowledged that Williams was crying because she and plaintiff had a disagreement:  Williams had accused plaintiff of plagiarizing some material in the Hospice bereavement plan, and she started crying when plaintiff denied her accusations.[23]

Plaintiff received another written warning on March 2, 2004.  The warning document described plaintiff's violation as follows:

> On 2-25-04 in a meeting with Jerry [plaintiff, Jerry Fleming] and Debbie Williams, Jerry referenced her past counseling session with him.  This was inappropriate for the setting and discussion.  He stated that he thought she was taking too much medication and was "too happy."  His meaning or purpose for this topic was unclear.  It was personal in nature and viewed by the recipient as an invasion of her privacy.  Prior to this meeting, Jerry called Debbie to attend the meeting.  He used a tone of voice that sounded like a father calling a child for discipline.  This was reported by Debbie and verified by another staff member.  These are 1. An abuse of authority 2. Violation of counselee confidentiality and 3. Inappropriate comments in front of the "boss."[24]

The following "Action Taken" was described:

> Goals/Objectives for Improvement: 1.  There will be no more communication to Debbie Williams that is abusive or in violation of counselee confidentiality.  2.  Jerry will ask other team members to restate his communication to ensure he is communicating clearly.  3. Jerry will restate the essence of the communications with others to

---

[23]Fleming Deposition, at 166-70.

[24]Tidwell Declaration, at Exhibit A.

ensure mutual understanding.  4.  As discussed on 2-25-04, Jerry will indicate he is listening to other team members by making eye contact. 5.  His verbal and nonverbal communication will send consistent messages.  6.  Jerry will try to pronounce patient names correctly so it [is] clear who he is talking about when reviewing deceased patients.[25]

Despite the disciplinary issues discussed above, plaintiff testified that he had a "good record," that all of his evaluations were "very good," that people under his ministry have written supportive letters about him, and that he received a "certificate of appreciation in March of 2008 for a job well done."[26]  There are no copies of any of these letters, evaluations, or certificates in the record.

In June of 2008, Tidwell recommended, as part of a cost reduction plan, that the positions of Hospice Chaplain and Bereavement Coordinator be combined.[27]  The Bereavement Coordinator position previously had been occupied by a man named Delbert Freeman, who was fifteen years younger than plaintiff and had completed only one unit of CPE.[28]  Tidwell recommended that Freeman, not plaintiff, be retained in the combined position because he felt Freeman was better qualified.  Tidwell based that decision on his experiences working with both plaintiff and Freeman.  Tidwell reviewed plaintiff's personnel file, but he did not recall considering any specific

---

[25]*Id.*

[26]Fleming Deposition, at 98-99.

[27]Tidwell Deposition, at 25-29.

[28]Plaintiff's evidentiary submission, Exhibit 1 (Affidavit of Jerry Fleming), at ¶¶ 4, 6.

9

employee evaluations, and he also did not recall considering Freeman's educational background in making the decision.[29]  In his declaration, Tidwell stated:

> I believed that Freeman was better qualified because Fleming had a history of conflict with co-workers, and because Fleming had what I viewed as sexist views towards women.  My conclusion that Freeman was better qualified had nothing to do with any sort of educational achievement or certification.[30]

Tidwell's recommendation was approved by a "leadership group" at CRMC composed of the hospital president and vice-presidents.[31]  On June 16, 2008, Toni Geddings and Jim Miller, the Human Resources Director and Vice-President of CRMC, met with plaintiff to inform him that his employment was being terminated.[32] No one from CRMC ever provided plaintiff with a reason why his employment was being terminated, except that Jim Miller told him during the June 6 meeting that he did not pass a review.[33]  Plaintiff disputes that he ever was subjected to a review, however.[34]

The date for plaintiff to vest in his pension with CRMC was July 28, 2008. During the June 16, 2008 termination meeting, plaintiff told Miller and Geddings that

---

[29]Tidwell Deposition, at 37-41.

[30]Tidwell Declaration, at ¶ 4.

[31]Tidwell Deposition, at 25-26.

[32]Geddings Declaration, at ¶ 4; Fleming Deposition, at 98.

[33]Fleming Deposition, at 98, 152.

[34]*Id.* at 152.

he thought it "seemed strange" that he was being terminated so close to his vesting date.[35]  Both Miller and Geddings stated they did not know plaintiff was so close to his vesting date.  In fact, according to plaintiff's deposition testimony, none of the individuals who actually were involved in the decision to eliminate plaintiff's position and terminate his employment had actual knowledge of his vesting date.[36]  Miller asked Geddings if there was any way that plaintiff could be vested despite his termination date, but Geddings told him the policies about vesting dates were firm, and no exceptions could be made.[37]  Even so, Jim Miller sent plaintiff a letter on CRMC letterhead on July 3, 2008, stating:

> Dear Mr. Fleming:
>
> We have been trying to contact you since you brought it to our attention that you were near vesting in your retirement.  Provided that you do not return to the campus for any purpose unless directed to do so by me, and provided that you remain available to perform such duties as I may direct, we will continue to pay you your normal pay through July 28, 2008.  Accordingly, you will remain employed through your vesting date.[38]

Ms. Geddings also testified that CRMC made certain that plaintiff remained on the payroll through July 29, 2008, his vesting date, and that CRMC direct deposited

---

[35]*Id.* at 127.

[36]*Id.* at 128-31.

[37]*Id.* at 127-28, 145, 149, 153-54.

[38]Defendant's evidentiary submission, at Exhibit 3 (July 3, 2008 letter).

11

plaintiff's regular paycheck into his account until the end of July 2008.[39]  Further, on February 23, 2010, Geddings requested and received the following letter from Lincoln Financial Group, the administrator of CRMC's pension plan:

> To Whom It May Concern:
>
> This letter is in reference to Mr. Jerry Fleming's vesting status with Lincoln Financial Group.  Our records from Cullman Regional Medical Center indicate Mr. Fleming's hire date to be 7/27/2003 and his termination date to be 7/29/2008.
>
> In order to qualify for 100% vesting status, an employee has to have 5 years of service at CRMC.  As stated above, Mr. Fleming meets that criteria and is therefore vested at 100%.[40]

Plaintiff acknowledged in his deposition that CRMC kept him employed until his vesting date so that he would vest, but he pointed out that CRMC only decided to do so after he contacted a lawyer.[41]  Plaintiff does not monitor his bank account closely, and he does not recall whether he continued to receive his full pay through July 28, 2008.[42]  He also has never contacted Lincoln Financial or CRMC directly to verify whether his pension vested.[43]

## III. DISCUSSION

---

[39]Geddings Declaration, at ¶¶ 7-8.

[40]Geddings Declaration, at Exhibit A (February 23, 2010 letter).

[41]Fleming Deposition, at 75.

[42]*Id.* at 110-12.

[43]*Id.* at 75-76.

12

**A.     ERISA Claim**

Plaintiff claims that defendant violated ERISA because it terminated his employment in order to prevent him from vesting in his pension.[44]  Section 510 of ERISA provides, in pertinent part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 *et seq*.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140.  The Eleventh Circuit has held that "§ 510 prohibits the employer from discharging an employee for the purpose of preventing the employee from receiving additional vested benefits."  *Clark v. Coats & Clark,* 990 F.2d 1217, 1222 (11th Cir. 1993) (citing *Seaman v. Arvida Realty Sales*, 985 F.2d 543, 445-56 (11th Cir. 1993); *Conkwright v. Westinghouse Electric Corp*., 933 F.2d 231, 238 (4th Cir. 1991)).

> The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights.  *Id.* at 546; [*Owens v. Storehouse, Inc.,* 984 F.2d 394, 399 (11th Cir. 1993)]. A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge *but must show more than the incidental loss of benefits as a result of a discharge.  Arvida*, 985 F.2d at 546.

---

[44]*See* Complaint, at ¶¶ 16-18.

13

*Clark,* 990 F.2d at 1222-23 (emphasis supplied).

In the absence of any direct evidence of an intent to interfere with ERISA rights, the court must follow the burden-shifting framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under that now-familiar analytical standard, the plaintiff is initially required

> to demonstrate by the preponderance of the evidence a *prima facie* case of discrimination. *Burdine,* 450 U.S. at 252-53, 101 S. Ct. at 1093-94 If the plaintiff does so, a presumption of discrimination is created, and the defendant must articulate a legitimate nondiscriminatory reason for its conduct. *Id*. at 253, 101 S.Ct. at 1093. If the defendant provides an acceptable reason for its conduct, the presumption of discrimination disappears, and the plaintiff must demonstrate that the reason given was a mere pretext for discrimination. *Id*.

> The burden of establishing a *prima facie* case is not onerous. *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093. In the context of a § 510 claim alleging unlawful discharge, a plaintiff may establish a prima facie case of discrimination by showing (1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. *Turner v. Schering-Plough Corp*., 901 F.2d 335, 347 (3d Cir. 1990); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114-15 (2d Cir. 1988). To satisfy the last element the plaintiff does not have to prove discriminatory intent but must introduce evidence that suggests interference with ERISA rights was a motivating factor. *Turner*, 901 F.2d 348. The plaintiff, however, cannot establish a *prima facie* case merely by showing that, as a result of the termination, he was deprived of the opportunity to accrue more benefits. *Id.*; *Clark v. Resistoflex Co.*, 854 F.2d 762, 771 (5th Cir. 1988). Moreover, measures designed to reduce costs in general that also result in an incidental reduction in

14

> benefit expenses do not suggest discriminatory intent. *Unida v. Levi Strauss & Co.*, 986 F.2d 970, 979 (5th Cir. 1993); *see also Conkwright*, 933 F.2d at 239. Instead, the employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular. *See Unida*, 986 F.2d at 979. One way for the employee to satisfy this burden is to show that his termination resulted in a substantial savings in benefit expenses. *See Dister*, 859 F.2d at 1115 (termination four months prior to vesting of enhanced pension plan resulting in $550,000 savings created inference of discrimination).

*Clark,* 990 F.2d at 1223-24.

Here, plaintiff cannot show more than an incidental loss of benefits as a result of his discharge.  In fact, plaintiff did not lose *any* benefits as a result of the discharge.  He acknowledged that he continued to be paid by CRMC through July 27, 2008, and that, as a result of CRMC's efforts to keep him on the payroll, he became vested in his pension.  For the same reasons, plaintiff cannot establish a *prima facie* case of discriminatory interference with his ERISA rights.  While plaintiff might be able to establish the first two elements — entitlement to ERISA benefits and qualification for his job — he cannot point to any circumstances that support a reasonable presumption of an intent to discriminate.  The initial decision to eliminate plaintiff's position and terminate his employment may have been made only a short period of time before plaintiff was due to vest, but that fact carries little weight when considering that none of the individuals involved in the position elimination and termination decisions were actually aware of plaintiff's upcoming vesting date.

15

Additionally, the evidence shows that, soon after defendant learned about the upcoming vesting date, it took measures to ensure that plaintiff would remain employed through that date. That evidence indicates an intent to *comply* with ERISA, *not* an intent to interfere with plaintiff's ERISA rights.

Furthermore, even if plaintiff could establish a *prima facie* case of ERISA interference, he could not demonstrate that defendant's legitimate, non-discriminatory reasons for terminating his employment were a mere pretext for an intent to interfere with ERISA rights. Defendant asserts that plaintiff's employment was terminated because his position was eliminated in an effort to cut costs. Plaintiff has no evidence to refute, or even weaken, that assertion. Plaintiff points out that defendant only decided to reinstate his employment and allow him to vest after it found out that he hired an attorney. That fact may be true, but the court strains to see its relevance. Plaintiff has cited no authority to suggest that an employer's decision to comply with the law only after learning of the threat of legal action is proof of pretext, especially when the persons who made the decision to terminate plaintiff's employment were admittedly unaware of his upcoming vesting date.

In short, there simply is no evidence to support plaintiff's claim that defendant decided to eliminate his position and terminate his employment in an effort to prevent him from vesting in his ERISA pension. Accordingly, his claim for interference with

ERISA rights must fail.

**B.      AADEA Claim**

Plaintiff's only remaining claim is under the Alabama Age Discrimination in
Employment Act.[45]  Having determined that summary judgment is due to be granted
as to all of plaintiff's federal claims, the court declines to exercise supplemental
jurisdiction over the remaining state-law claim.  Pursuant to 28 U.S.C. § 1367(c), a
district court may decline to exercise supplemental jurisdiction if "the district court
has dismissed all claims over which it has original jurisdiction."  *Id.*  Further, the
Eleventh Circuit has regularly reiterated that "'if the federal claims are dismissed
prior to trial, [the Supreme Court's decision in *United Mine Workers v.*] *Gibbs*[, 383
U.S. 715 (1966)], strongly encourages or *even requires dismissal* of state claims.'"
*Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999) (emphasis supplied)
(alterations supplied) (quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735
F.2d 414, 428 (11th Cir. 1984) (citing *Gibbs*, 383 U.S. at 726)).  Plaintiff's AADEA
claim will, therefore, be dismissed without prejudice.

### IV. CONCLUSION AND ORDER

In accordance with the above, defendant's motion for summary judgment is
GRANTED.  It is ORDERED that plaintiff's claim for interference with ERISA rights

---

[45]Plaintiff did not file a claim under the federal Age Discrimination in Employment Act, 29
U.S.C. § 621 *et seq*.

(Count One) is DISMISSED with prejudice.  Plaintiff's claim for violation of the

AADEA (Count Two) is DISMISSED without prejudice.  Defendant's motion to

strike portions of plaintiff's affidavit is DENIED as moot.  Costs incurred herein are

taxed as paid.  The Clerk of Court is directed to close this file.

DONE this 7th day of March, 2011.

_____

United States District Judge